# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JESSICA PEARSON,

        Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION,

        Defendant.

**MEMORANDUM OF LAW &  ORDER**
Civil File No. 13-889 (MJD/JSM)

Joshua R. Williams, Law Office of Joshua R. Williams, PLLC, Counsel for Plaintiff.

David A. Schooler, Michael C. Wilhelm, and Ellen A. Brinkman, Briggs & Morgan, PA, Counsel for Defendant.

## I.    INTRODUCTION

This matter is before the Court on Defendant U.S. Bank National Association's Motion for Summary Judgment [Docket No. 20].  The Court heard oral argument on May 23, 2014.  Finding no genuine dispute of material fact, the Court grants Defendant's motion.

## II.    BACKGROUND

## A. Factual Background

Plaintiff Jessica Pearson began working for U.S. Bank National Association ("U.S. Bank") on December 23, 2009.  (Schooler Aff., Docket No. 26, Ex. 1, Pearson Dep. 117.)  She was hired as a "Sales Manager 2, Grade 14," based on her previous experience working at Norwest Bank/Wells Fargo and Chase Bank from 1999 to 2009.  (Pearson Dep. 76-77, 129.)  Plaintiff's job duties included selling prepaid debit cards to businesses that they could use to pay their employees. (Pearson Dep. 134-37.)

### 1. Plaintiff's Ninety-Day Performance Review

Rick Pileggi was Plaintiff's first supervisor at U.S. Bank.  (Pearson Dep. 134.)  Pileggi gave Plaintiff a 90-day performance review on March 15, 2010. (Osmond Aff., Docket No. 23, Ex. 1.)  In that review, Pileggi stated that Plaintiff "needs improvement" under categories of "teamwork and cooperation," "resourcefulness," and "commitment."  (<u>Id.</u> at D00113-14.)  Pileggi also gave Plaintiff an "overall employee rating" of "needs improvement."  (<u>Id.</u> at D00114.) The comments in Pileggi's "resolution plan" were as follows:

> Jessica is very energentic [sic] and motivated.  I currently have challenges with her dedication and professionalism.  She needs to focus on her job and make a committment [sic] to being part of the team and improving her internal relationships.  We have spoken

about this and she understands and my hope is that she will improve things and be a member of the Prepaid team for years to come.

(Id.)

## 2. June 2011 Performance Improvement Plan

In February 2011, Plaintiff's supervisor changed from Rick Pileggi to Tom Ayers.  (Pearson Dep. 139-41.)  This was the result of an organizational change.  (Id. at 140.)  Plaintiff's job duties, however, remained unchanged.  (Id. at 140-41.)

On June 10, 2011, Ayers placed Plaintiff on a Performance Improvement Plan ("PIP").  (Osmond Aff., Ex. 2.)  The PIP was signed by both Plaintiff and Ayers.  (Id. at D00118.)  The plan explained to Plaintiff that "it is critical that you demonstrate significant improvement in achieving your work objectives."  (Id. at D00115.)  The PIP then listed "Specific Performance Issues and Examples," which included the following:

- "Overall Business Knowledge (literacy)": "[W]e've discussed your fundamental lack of understanding business case methodology, basic financial accounting, and the background product expertise required to effectively sell prepaid products;"

- "Business Acumen": "On several occasions I've witnessed your lack of utilizing good judgment and/or putting the group in a situation

which is not reflective of our professionalism or paints us in the best

possible light;"

- "Unprofessionalism," including "talking to co-workers about

  frustrations with managers which is then shared with others in the

  department;" and

- "General H/R Management": "Also per our discussions about your

  performance is the reoccurring problem with your on-time

  reporting, completeness and thoroughness with reporting, and

  routine lateness."

(Id. at D00115-16.)

The PIP also listed examples in which Plaintiff was late for meetings, client

calls, and submitting reports. (Id.) The PIP provided a list of expectations for

Plaintiff to meet during the subsequent 60-day period. (Id. at D00116-17.)

Plaintiff testified that, while she did not agree with the June 2011 PIP, she

did not believe it was discriminatory. (Pearson Dep. 190, 218.) Plaintiff stated

that it was legitimate for U.S. Bank to be concerned about her timeliness, and the

criticisms in the PIP about her timeliness were valid. (Id. at 207-08, 229.)

By the end of the 60-day period, U.S. Bank determined that Plaintiff's performance had sufficiently improved, so she was taken off of the PIP.  (Id. at 210.)  Plaintiff understood that she would need to continue meeting expectations going forward, however, and she understood that a failure to meet expectations could result in additional discipline.  (Id. at 210-11.)

### 3. February 2012 Performance Review

In January of 2012, Plaintiff asked Ayers how he would rate her performance for 2011.  (Pearson Dep. 218-21.)  Ayers responded that he would give her a rating of either "4" ("performance does not consistently meet expectations") or "5" ("even with additional coaching and supervision, does not meet expected levels").  (Id.)  Ayers explained to Plaintiff that either of these ratings would make Plaintiff ineligible for a bonus for 2011.  (Osmond Aff., Ex. 3.)

On February 29, 2012, Plaintiff received her 2011 performance review from Ayers.  (Osmond Aff., Ex. 4.)  She was rated as a "4," meaning her "[p]erformance does not consistently meet expectations."  (Id. at D00094.)  Plaintiff understood that her rating meant that she had serious performance deficiencies.  (Pearson Dep. 223.)  Ayers noted that Plaintiff had only closed 12 deals in 2011 when her goal was 25.  (Pearson Dep. 242-43.)  Plaintiff disputes

5

that she only closed 12 deals, claiming that she actually closed 14 deals.  (Pearson

Dep. 245-46.)

Ayers noted the following additional performance concerns in the

February 2012 performance review:

- "I feel that Jessica lacks the core competencies to effectively

  negotiate agreements with prospective clients.  In fact, I would not

  allow Jessica to negotiate or change any agreement without my

  express permission and after careful review."

- "[S]he doesn't have an understanding of business case methodology

  or the financial repercussions of the decisions she was making."

- "I have spent an extraordinary amount of time coaching, providing

  feedback, and alerting Jessica to perceptions (real and perceived)

  this year.  We routinely would discuss her inability to 'own' the

  issues confronting her performance."

(Osmond Aff., Ex. 4, at D00095-96.)

The performance review also indicated the concern about Plaintiff's

timeliness:

This is definitely not one of Jessica's strongest attributes.
Work is routinely turned in late, with grammatical errors, spelling

mistakes, differing fonts, and not of the caliber expected for the
position she holds.  I feel this may be the result of a general lack of
understanding basic business writing, and secondly, an inability to
manage ones [sic] time effectively.  Aside from Jessica's comments
that this was resolved when brought to her attention, there are
documented cases of lateness and unprofessional management
reports as recently as December 2011.

(<u>Id.</u> at D00097.)  Plaintiff agreed that the criticisms about her timeliness were

valid, and she stated in her deposition that "timeliness is something that I'm

constantly working on."  (Pearson Dep. 228-29.)  Plaintiff also stated that Ayers

did not treat her unfairly in any way.  (<u>Id.</u> at 252.)

### 4. Plaintiff Is Transferred to Campus Banking

As a result of a request made by Plaintiff, she was transferred to U.S.

Bank's Campus Banking group in February of 2012.  (Pearson Dep. 141, 255.)

The Campus Banking group focuses on colleges and universities as its primary

customers.  (Pearson Dep. 142.)  In that group, Plaintiff was responsible for

selling not only AccelaPay payroll cards, but also other campus banking cards

and campus ID cards.  (Pearson Dep. 143-44.)

When Plaintiff joined the Campus Banking group, her supervisor changed

from Tom Ayers to Ben Osmond.  (Pearson Dep. 141.)  Because of Plaintiff's past

performance problems, Osmond met with Plaintiff and provided to her a list of

"expectations and commitments."  (Osmond Aff. ¶ 6, Ex. 5.)  Osmond asked

Plaintiff to prepare the list herself and then he added his own input regarding his expectations for Plaintiff.  (Pearson Dep. 262-63.)  The result was a document entitled "2012 Expectations and Commitments – Jessica Pearson," which listed expectations under the headings of "Professionalism," "H/R Management," "Communication," "Professionalism/Communication," and "Sales Expectations."  (Osmond Aff., Ex. 5.)  Some of the goals listed were: (1) "continue to demonstrate professionalism," (2) "I will submit all deliverables on time," (3) "I will be in the office by no later than 9am everyday," and (4) "Expectation that Jessica will be on time for all meetings and calls."  (Id.)

The document also set forth Plaintiff's 2012 sales goals:

- "Close a total of 8 prepaid deals (AccelaPay, Rewards, Per Diem, etc.) on college campuses that meet minimum thresholds for active cards, and profitability.  TBD on deal to deal basis;" and

- "Close 1 campus card ID program in upper Midwest territory. (minimum of 2,000 students)."

(Id. at D00170.)

While Osmond supervised Plaintiff, he kept contemporaneous notes regarding their meetings.  (Osmond Aff. ¶ 7, Ex. 6 ("Jessica Pearson Event

Timeline").)  The parties dispute whether the notes were made contemporaneously with her meetings with Osmond.  Defendant maintains that Osmond created this document in February 2012 and updated it as time went on. (See Williams Decl., Docket No. 30, Ex. F, Def.'s Answers to Pl.'s Second Set of Interrogs., Interrog. No. 6.)  Through discovery, Defendant stated that there were multiple versions of the Jessica Pearson Event Timeline, but maintained that they were created contemporaneously with the events described within them.  (Id.; see also Williams Decl., Exs. G, H.)  Defendant states that Osmond edited the Jessica Pearson Event Timeline to correct spelling and grammatical errors, and he revised the document in order to streamline it for other readers in the Human Resources ("HR") Department later on.  (Id.)

Plaintiff disputes whether the Jessica Pearson Event Timeline was created in February 2012; she argues that it was created after she later submitted a complaint regarding Osmond's treatment of her, in December 2012.  (See Pl.'s Opp'n 9-10.)

Regardless of this dispute, Defendant cites Osmond's notes in describing some of the interactions between Osmond and Plaintiff.  Osmond indicated that Plaintiff was 15 minutes late to her second meeting with him on February 10,

2012.  (Jessica Pearson Event Timeline, at D00159.)  At that meeting, Plaintiff's

"BDR spreadsheet"—a spreadsheet that she used to keep track of customers and

prospective customers—was not accurately updated, and this was noted by

Osmond.  (Id.; Pearson Dep. 257.)

### 5. June 2012 Verbal Counseling Warning

On May 31, 2013, Osmond provided Plaintiff with "verbal counseling"

(i.e., a verbal written warning) regarding her performance related to a potential

deal with a customer named Bon Ton; this was later documented by Osmond on

a "Verbal Counseling" form document.  (Osmond Aff., Ex. 7.)  The counseling

was given because three U.S. Bank employees who worked on the Bon Ton

project—Rick Pileggi, Tom Ayers, and Pat DiSanto—complained to Osmond

about Plaintiff's performance on the project.  (Osmond Aff. ¶ 8; Jessica Pearson

Event Timeline, at D00160.)  These co-workers specifically complained that

Plaintiff waited until the project deadline to complete a final document review.

(Osmond Aff. ¶ 8.)  Plaintiff admits that this happened.  (Pearson Dep. 287-88.)

Because Plaintiff waited until the due date, she and Pat DiSanto had to stay at

work until 7:00 p.m. to complete the Bon Ton project.  (Id. at 290.)

On the Verbal Counseling form, Osmond stated that he advised Plaintiff

that "[i]t is unacceptable to have a due date of the 25th and to have final review of

a document take place on the same day, while you are scheduled to be on vacation." (Osmond Aff., Ex. 7.)  He further stated that U.S. Bank's expectation is that "[a]ll deliverables will be completed not only on time, but with adequate time for all interested parties to review and approve." (Id.)  Osmond then warned that "[f]ailure to meet these expectations may result in . . . further disciplinary action, up to and including termination." (Id.)

### 6. The University of Rochester Proposal

On June 8, 2012, approximately one week after Osmond discussed Plaintiff's poor performance on the Bon Ton project, Plaintiff waited until the last minute to prepare documents for a Request for Proposal for the University of Rochester. (Osmond Aff. ¶ 9; Jessica Pearson Event Timeline, at D00160.) Osmond had another discussion with Plaintiff about her performance, and he explained that it was unacceptable. (Jessica Pearson Event Timeline, at D00160.)

### 7. Comment Made About Plaintiff During a Management Meeting

Sometime in July or August of 2012, Plaintiff recounts that "[a] co-worker told me she heard that Osmond told one of our co-workers, in reference to me, that 'just because she is pretty and flips her long, blond hair, it doesn't mean she will get her way.'" (Pearson Decl., Docket No. 31, ¶ 4.)  Plaintiff heard about the

alleged comment from co-worker Carmelle Abron.  (Pearson Dep. 41.)  Abron

did not witness the comment directly, but heard about the alleged comment from

another employee, Kelly Rowe, who overheard the comment at a management

meeting.  (Id. at 41-42.)  Osmond denies that he made the statement.  (Osmond

Dep. 88.)

### 8. August 2012 Final Written Warning

On August 30, 2012, Osmond provided Plaintiff with a "Final Written

Warning" regarding her unsatisfactory performance.  (Osmond Aff., Ex. 8.)  The

warning listed areas of concern, starting with complaints regarding Plaintiff's

performance on a proposal for the University of Wisconsin.  (Id.)  Osmond noted

that the Regional Managers for Wisconsin communicated their concerns to him

that Plaintiff was "not listening to what's important to the customer" during a

conference call, to the point where the customer said aloud on the call, "This call

is a waste of time."  (Id. at D00144.)  The customer then asked the Regional

Managers to appoint someone other than Plaintiff on the call—someone who

could "handle their request"—and they expressed that they had lost

"confidence" in Plaintiff's ability to deliver.  (Id.)  Osmond wrote that "[t]here

was concern expressed about your sales skills and preparation for the calls with

the [University of Wisconsin] system.  The words 'unpolished' and 'amateur'

12

were specifically used."  (Id.)  Osmond recounted on the Final Written Warning

that "[t]he [University of Wisconsin] calls were described as 'extremely painful.'"

(Id.)

The Final Written Warning also addressed concerns about a late expense

report and Plaintiff's continuing "pattern of not meeting deliverables on time."

(Id.)  It went on to describe an instance when a client at the University of

Washington expressed that they had not heard back from Plaintiff after she was

asked to follow up with them on June 29, 2012.  (Id.)  The client eventually

resorted to contacting Osmond directly on July 11, 2012.  (Id.)  Plaintiff stated

during her deposition that she missed the client's email.  (Pearson Dep. 294-95.)

The Final Written Warning went on to describe another instance of

Plaintiff waiting until the last minute to complete her work: similar to her

performance and the Bon Ton and University of Rochester proposals, Plaintiff

failed to provide her deliverables for a Request for Proposal for the University of

Washington until the last minute on the day it was due.  (Osmond Aff., Ex. 8, at

D00144.)  Plaintiff admitted during her deposition that "we were scrambling that

day to get it done."  (Pearson Dep. 315.)  The Final Written Warning stated that,

"[a]s we have discussed numerous times, it is unacceptable to wait until the last minute to complete deliverables."  (Osmond Aff., Ex. 8, at D00144.)

The conclusion of the Final Written Warning reads:

> Jessica, most of these expectations . . . were already articulated in your Performance Improvement Plan in June 2011, and while you successfully completed that plan, your performance has now again deteriorated and become unacceptable.  In this event, the company reserved the right to take additional disciplinary action, and has done so in a documented Verbal Warning in June of 2012, and now in this final Written Warning.
>
> Failure to meet these expectations will result in additional . . . disciplinary action, up to and including termination, without further notice.

(Id. at D00145.)

### 9. Plaintiff's Failure to Use U.S. Bank's Client Relationship Management Software

After the Final Written Warning, Plaintiff exhibited problems with respect to U.S. Bank's Client Relationship Management ("CRM") software.  (Osmond Aff. ¶ 11.)  The CRM software is used by the Campus Banking group to track leads and prospects for potential sales.  (Pearson Dep. 320.)  Although everyone in Campus Banking was expected to use CRM, Plaintiff admitted during her deposition that she did not use CRM "on a regular basis" in 2012 and that she was not following the protocol directed to her by her supervisors.  (Pearson Dep. 321.)

On November 29, 2012, Osmond counseled Plaintiff regarding her lack of use of CRM, and Plaintiff acknowledged that she had not been keeping CRM up-to-date.  (Osmond Aff. ¶ 11.)  Osmond made a note of this discussion with Plaintiff.  (Jessica Pearson Event Timeline, at D00164.)

### 10. U.S. Bank Decides to Terminate Plaintiff

Due to Plaintiff's performance problems, Osmond regularly communicated with his direct supervisor in the Campus Banking group, Whitney Bright, about Plaintiff.  (Osmond Aff. ¶ 12.)  Bright proposed that U.S. Bank terminate Plaintiff for her performance problems as soon as June of 2012.  (Id.)  However, Bright and Osmond decided to give Plaintiff an opportunity to improve her performance instead.  (Id.)

In early December of 2012—after Plaintiff's Final Written Warning in August 2012 and her November 29, 2012, counseling regarding CRM—Osmond discussed Plaintiff's performance with Bright; Kevin Morrison, the Senior Vice-President of U.S. Bank's Prepaid Department; and Susanne Ingerson of U.S. Bank's HR Department.  (Osmond Aff. ¶ 13.)  Defendant maintains that, at this time, Osmond, Bright, and Morrison made the decision to terminate Plaintiff because of her cumulative performance issues.  (Id.)  Ingerson consulted with Osmond, Bright, and Morrison, but she did not participate in the final decision

because of her position in HR (At U.S. Bank, HR personnel only offer advice regarding termination decisions; they do not participate in final decision-making).  (Osmond Aff. ¶ 14; Ingerson Aff. ¶ 2.)

### 11. Plaintiff's Call to the HR Department and Allegation of Unfairness

Defendant asserts that, when the termination decision was made, Plaintiff had not reported any concerns about discrimination to U.S. Bank.  (Osmond Aff. ¶ 14; Ingerson Aff. ¶ 3.)  On December 10, 2012, Plaintiff called Ingerson and complained that she felt unfairly criticized by Osmond regarding her performance.  (Ingerson Aff. ¶ 4.)  Ingerson was familiar with Plaintiff's performance problems, and she explained to Plaintiff that Osmond was responding to Plaintiff's failure to meet U.S. Bank's expectations.  (Id.)  Ingerson then advised Plaintiff that she should listen to Osmond's feedback and ask questions if she did not understand the expectations.  (Id.)  The phone call was relatively short, lasting only about 20 minutes.  (Pearson Dep. 16.)

### 12. Meeting between Osmond and Plaintiff Regarding Her 2012 Performance

On December 20, 2012, Osmond met with Plaintiff during a regular supervisory meeting.  (Osmond Aff. ¶ 15.)  There, Osmond explained to Plaintiff that she was not meeting her expectations for the year and that he would likely

16

rate her a "4" ("does not consistently meet expectations") on her performance review for 2012.  (Id.)  Plaintiff responded by stating "I know I'm good at this job," and "I did nothing wrong."  (Id.)  After the meeting, Plaintiff requested to leave work early, and Osmond allowed her to do so.  (Id.)

### 13. Plaintiff's Complaint of Discrimination and HR's Investigation

On December 26, 2012, Plaintiff called U.S. Bank's ethics and compliance hotline and complained that Osmond was discriminating against her on the basis of gender and appearance.  (Mohs Aff., Docket No. 24, ¶ 2, Ex. 1.)  While the contents of the call are unknown, Plaintiff later raised that she was treated differently in several ways.  First, Plaintiff argues that she was the only member of Osmond's team that he did not go on sales calls with, even though Plaintiff requested him to do so.  (Osmond Dep. 83.)  Osmond explained during his deposition that, on the couple of sales calls Plaintiff asked him to join, he had other obligations on his calendar.  (Osmond Dep. 82.)  Osmond also stated in his deposition that Plaintiff had "other support from U.S. Bank employees that were at those calls with her."  (Osmond Dep. 83.)

Second, Plaintiff cites that she was the only member of Osmond's team whom he required to be at her workstation by 9:00 a.m.  (Osmond Dep. 89.)

Osmond's deposition provides that he and Plaintiff "came to the agreement that she would be at her desk by no later than 9:00 a.m." because both of them knew that she struggled with timeliness.  (Osmond Dep. 86.)

Finally, Plaintiff states that her sales territory was only five states, whereas her male team members' sales territories were 10 states each.  (Osmond Dep. 89.) Osmond's deposition also provides, however, that Plaintiff had a five-state territory for the college ID programs, as well as a 50-state territory for payroll and rewards deals; therefore, Osmond maintains that her territory was larger than the other members of the team.  (Osmond Dep. 87.)  Plaintiff, however, denies the contention that she had a 50-state territory for anything; instead, she maintains that her sales territory was five states for all deals.  (Pearson Decl., Docket No. 31, ¶ 2.)  Osmond also stated in his deposition that Plaintiff's college ID sales goal was significantly less than those of her peers.  (Id.)

In response to Plaintiff's call about disparate treatment, Mary Mohs of U.S. Bank's HR Department began an investigation into Plaintiff's complaint.  (Mohs Aff. ¶ 2.)  Mohs interviewed Plaintiff, Osmond, Bright, and Ingerson, and she reviewed a number of documents, which included: the 2012 Expectations and Commitments document, the Jessica Pearson Event Timeline provided to her by

Osmond, Plaintiff's 2011 PIP, Plaintiff's 2012 Verbal Counseling form, and Plaintiff's August 2012 Final Written Warning.  (Mohs Aff. ¶ 3.)

Mohs also reviewed a document prepared by Osmond that compared Plaintiff's actual sales performance in 2012 with the sales goals established in her 2012 Expectations and Commitments.  (Mohs Aff. ¶ 4.)  This document shows that Plaintiff closed three of the eight prepaid deals on college campuses that Plaintiff was expected to close in 2012.  (Mohs Aff., Ex. 2, at D00191.)  The document also indicates that Plaintiff closed zero of one campus ID card program that she was expected to close in 2012.  (Id.)

Mohs kept a record of her investigation on a written document.  (Mohs Aff., Ex. 3.)  Regarding Plaintiff's claims of gender discrimination and allegation that she was treated differently than her male counterparts in the Campus Banking group, Mohs found that the male employees with whom Plaintiff was comparing herself had different employment circumstances: "There are 5 employees reporting to Benjamin Osmond.  1 female and 4 males.  Jessica Pearson is the female.  Pearson is a Grade 14 Sales Manager.  The male employees are Grade 13 Sales Representatives."  (Id. at D00177.)

Mohs also found the following:

> Pearson did not meet all of her established goals and objectives for
> 2012.   Specifically, she continues to miss deadlines of key
> deliverables, she has continued issues with schedule adherence, she
> didn't sign any campus card programs and she sold 3 other prepaid
> programs on college campuses.  In addition, she is credited with
> selling 1 non-campus program.

(Id.)  Mohs determined that there were two male Sales Representatives in

Campus Banking who did not meet their goals and objectives in 2012.  (See id.)

Of the first male employee, Mohs wrote: "Former co-worker, Nicholas Brown,

was placed on a Performance Improvement Plan in January 2012 because he was

not meeting his goals and objectives.  Brown resigned in 2012."  (Id.)  Regarding

the other male employee, Mohs stated: "Current co-worker Andrew Heesen did

not meet his sales objectives for 2012, but did achieve his objectives in all other

categories.  He has received verbal coaching."  (Id.)

Mohs found that Osmond acted inappropriately when he asked Plaintiff's

sister (also an employee at U.S. Bank), "Is your sister late for everything in her

personal life too?" during the summer of 2012.  (Id. at D00177-78.)  Mohs found

no evidence to support the conclusion that Osmond made the comment or took

any other action due to Plaintiff's gender, as opposed to her job performance.

(Mohs Aff. ¶ 6.)  At the conclusion of her investigation, Mosh determined that

"[t]here is no evidence that Osmond is discriminating against Pearson due to her gender or appearance." (Mohs Aff., Ex. 3, at D00178.)

On February 4, 2013, Mohs reported to Plaintiff that the investigation concluded that there was no evidence of discrimination by Osmond on the basis of gender or appearance. (Mohs Aff. ¶ 7; Pearson Dep. 336-37.) Plaintiff asked Mohs if it would be "business as usual" going forward, and Mohs told her "yes." (Pearson Dep. 337.)

### 14. Plaintiff's Termination from U.S. Bank

On February 20, 2013, Osmond and Dave Smith, a Product Manager at U.S. Bank, met with Plaintiff and informed her of her termination. (Pearson Dep. 10-11.) Plaintiff disputes the timing of U.S. Bank's termination decision, which Defendant maintains was in early December. (See Pl.'s Opp'n 3.) Plaintiff argues that it makes no sense that the decision would be made in early December, while U.S. Bank did not terminate her until February. Plaintiff claims that none of Defendant's evidence shows that the termination decision was made in early December. Notably, however, the Osmond and Ingerson affidavits support that the decision was made in early December. (See Osmond Aff. ¶13; Ingerson Aff. ¶ 2.)

### B.  Procedural Background

21

In March 29, 2013, Plaintiff filed a lawsuit in Hennepin County District

Court against Defendant.  [Docket No. 1, Ex. 1]  On April 17, 2013, Defendant

removed the case to this Court.  [Docket No. 1]  Plaintiff's Complaint [Docket

No. 1, Ex. 1] alleged Count I: Violation of the Minnesota Human Rights Act

("MHRA") – Sex Discrimination; and Count II: Violation of the MHRA –

Reprisal.

## III.    DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

To defeat summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotation marks omitted) (citation omitted).

### B.  Plaintiff's Claims Under the MHRA

Plaintiff alleges that Defendant engaged in sex-based discrimination and reprisal against Plaintiff.  The few factual disputes in this matter are neither genuine nor material.  Viewing the facts in the light most favorable to Plaintiff, the Court concludes that no reasonable factfinder would find for Plaintiff on either claim.

Under the MHRA, an employer may not, because of sex, "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."  Minn. Stat. § 363A.08, subdiv. 2.  Similarly, it is illegal for an employer to engage in any reprisal against an employee who opposes an unlawful employment practice.  Id. § 363A.15.  "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment."  Id.

### C. Legal Standard for Discrimination Claims Under the MHRA

In analyzing discrimination claims under the MHRA, courts "apply the principles developed in the adjudication of claims under Title VII because of the substantial similarities between the two statutes." Springer v. McLane Co., Inc., 692 F. Supp. 2d 1050, 1054 (D. Minn. 2010).  To establish a sex discrimination claim, a plaintiff may provide direct evidence of discrimination.  Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 953 (8th Cir. 2012).  Direct evidence must show "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Torgerson, 643 F.3d at 1044 (internal quotation marks omitted).

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr., 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted).  "Direct evidence does not include stray remarks in the

workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006) (internal quotation marks omitted).

Alternatively, Plaintiff may establish the claims by creating an inference of unlawful discrimination under the three-step burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). Under this analysis, "the plaintiff bears the burden of establishing a prima facie case of discrimination." McGinnis v. Union Pac. R.R., 496 F.3d 868, 873 (8th Cir. 2007). A plaintiff establishes a prima facie case by showing that: (1) she is a member of a protected group; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected group were treated differently. Philip v. Ford Motor Co., 413 F.3d 766, 768 (8th Cir. 2005). If a plaintiff establishes a prima facie case, she "creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate non-discriminatory reason for the action." Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 990 (8th Cir. 2011). Lastly, a plaintiff "may still demonstrate the employer's

proffered reason was pretextual and unlawful discrimination was a motivating factor in the adverse employment decision." Id.

With respect to the fourth "similarly situated" element, Plaintiff must establish that she was treated differently from those employees whose violations were of comparable seriousness. Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988). Plaintiff must prove that those employees similarly situated "in all relevant respects." Ricks v. Riverwood Int'l Corp., 38 F.3d 1016, 1019 (8th Cir. 1994). The test for whether employees are similarly situated to warrant a comparison to the plaintiff is "rigorous." Harvey v. Anheuser–Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994).

One way to meet the fourth element of the prima facie burden under the circumstances of the present case is to show that Plaintiff and a similarly situated male "were involved in or accused of the same or similar conduct and were disciplined in different ways." Shaffer v. Potter, 499 F.3d 900, 905 (8th Cir. 2007). To prove discrimination based on similarly situated persons of another sex, however, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same

conduct without any mitigating or distinguishing circumstances." <u>Hervey v. Cnty. of Koochiching</u>, 527 F.3d 711, 725 (8th Cir. 2008).

### D. Sex-Based Discrimination Under the Direct Method

Plaintiff attempts to establish discrimination under the direct method. Viewing the record as a whole, the Court concludes that Plaintiff's claim ultimately fails under the direct method because Plaintiff cannot demonstrate that any statement or conduct by Osmond and other decision-makers was discriminatory and connected to the termination decision.

As an initial matter, Plaintiff urges the Court to consider her claim exclusively under the direct method and argues that the burden-shifting analysis is not required for her discrimination claim. However, under either method, Plaintiff's claim fails.

Plaintiff's strongest evidence of a discriminatory attitude appears to be her claim that "[a] co-worker told me she heard that Osmond told one of our co-workers, in reference to me, that 'just because she is pretty and flips her long, blond hair, it doesn't mean she will get her way.'" (Pearson Decl. ¶ 4.) The occurrence of this comment is disputed by the parties, as Osmond denies making such a comment. The dispute, however, is not genuine because Plaintiff

supports the comment only with the quoted statement above from her

declaration.  This statement is inadmissible.  It involves multiple levels of

hearsay because Plaintiff's co-workers' (Abron and Rowe) alleged statements are

out-of-court statements offered for the truth of the matter asserted.  Fed. R. Evid.

801(c).  Plaintiff argues that the alleged statement is admissible as an admission

of a party opponent.  Fed. R. Evid. 801(d)(2).  However, assuming this exception

applied, it would only apply to one level of hearsay: Osmond's alleged comment.

Plaintiff has not offered a reason why Rowe and Abron's statements about

Osmond's comment are admissible hearsay.  See Hoselton v. Metz Baking Co, 48

F.3d 1056, 1061 (8th Cir. 1995) ("When evidence contains multiple levels of out-

of-court statements, courts must examine each level to determine whether the

statements are in fact hearsay and, if so, whether each level meets the

requirements of some exception to the hearsay rule."); see also, Thomas v. Int'l

Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995) (holding that if an employee

"testif[ied] to what other employees told her about what . . . agents in turn told

them, then the testimony could constitute inadmissible hearsay.").  The Court

concludes that the evidence about Osmond's alleged comment is inadmissible.

Without the alleged comment by Osmond, Plaintiff asserts that the following facts as direct evidence of "differential treatment" towards Plaintiff:

(1)   Plaintiff was the only member of Osmond's team with whom he did not join on sales calls (Osmond Dep. 81.);

(2)   Plaintiff was the sole team member required to be at her workstation by 9:00 a.m. (Osmond Dep. 86.);

(3)   Plaintiff's sales territory was only five states, whereas her male team members' sales territories were 10 states each (Osmond Dep. 87-88.);

(4)   Plaintiff was excluded from team conference calls, while male team members were not excluded (Pearson Decl. ¶ 3.);

(5)   Osmond forbade Plaintiff from working remotely while allowing male team members to work remotely (Pearson Decl. ¶ 3.);

(6)   Osmond failed to recognize Plaintiff for training she gave to her team, while Osmond recognized a male team member for similar training (Pearson Decl. ¶ 3.);

(7)   Osmond formally reprimanded Plaintiff for purportedly not meeting her sales goals, while Osmond did not formally reprimand a male team

member—with more experience than Plaintiff—for not meeting sales goals (Osmond Dep. 59.);

(8)   Osmond shared a private communication about Plaintiff with other team members via email, and that was the only time he ever engaged in that sort of behavior (Osmond Dep. 36-37.);

(9)   Osmond made an inappropriate comment to Plaintiff's co-worker (who is also Plaintiff's sister) about her personal life, asking "Is your sister late for everything in her personal life too?", and Osmond did not make such inappropriate comments to male team members  (Mohs Aff., Ex. 3.); and

(10)  Osmond "papered" Plaintiff's file (i.e., fabricated documentation of Plaintiff's performance problems), while he did not paper male team member's files.

The Court concludes that Plaintiff's attempt to establish discrimination with direct evidence ultimately fails to survive summary judgment because, viewing the record in the light most favorable to Plaintiff, these facts fail to establish a discriminatory attitude that would permit a reasonable factfinder to infer that that attitude was a motivating factor in Defendant's termination decision.

Regarding number one, Plaintiff alleges that she was the only team member with whom Osmond did not join on sales calls, even though she requested to go on the calls with him. The record indicates that Osmond maintains he "already had either something on my calendar or the dates were changed" on the two to three occasions when Plaintiff asked Osmond to be on a call with her. (Osmond Dep. 81.) Osmond's decision not to join Plaintiff on her few requested sales calls may have been unwise, but it is insufficient to show sex-based discrimination towards Plaintiff. This act does not directly reflect Osmond's alleged discriminatory attitude.

With respect to number two above, Plaintiff alleges that Defendant required Plaintiff to be at her desk by 9:00 a.m. This fact does not reflect a discriminatory attitude. In light of Plaintiff's undisputed history of tardiness, this punctuality requirement reflects a legitimate employment response, and Plaintiff has neither alleged nor demonstrated that other employees supervised by Osmond had performance or timeliness issues similar to hers. Furthermore, Plaintiff contributed to the imposition of this requirement when she collaborated with Osmond in creating the "2012 Expectations and Commitments – Jessica Pearson" document. (Osmond Aff. ¶ 6, Ex. 5; Pearson Dep. 262-63 (listing

Plaintiff's goals) ("I will be in the office by no later than 9am everyday [sic].").)

Therefore, the requirement is not appropriately characterized as conduct solely

by Osmond, and therefore offers little support in Plaintiff's discrimination claim.

Regarding number nine, Osmond's inappropriate comment made to

Plaintiff's sister about Plaintiff's timeliness, it is notable that the comment was

gender-neutral and contained no express mention of gender other than use of the

phrase "your sister" to refer to Plaintiff.  Furthermore, the comment was made in

reference to a performance issue that Plaintiff admittedly struggled with.  (See

Pearson Dep. 228-29 ("[T]imeliness is something that I'm constantly working

on.").)  Because Plaintiff has not shown that any other members on her team had

problems with timeliness.  The comment does not directly reflect a

discriminatory attitude.

With respect to number three, Plaintiff alleges that her sales territory was

only five states, whereas her male team members' sales territories were 10 states

each.  However, the record reveals that Plaintiff was not similarly situated to her

male team members on this point.  Compared to her team members, Plaintiff was

in a higher-paid position, had different job duties, sold a different range of

products, and had different expectations.  While her team members were

required to sell only campus ID products, Plaintiff was required to sell both

campus ID products and payroll and rewards products.  (Osmond Dep. 11, 87-

88.)  Therefore, Plaintiff had lower sales goals for campus ID products than her

team members.  (Id. at 59; Osmond Aff., Ex. 5 (showing that Plaintiff's goal was

to sell one campus ID program, while a team member was required to sell a

program at either two large schools or six small schools).)  Plaintiff also

contributed to establishing her sales goals, which were defined in the "2012

Expectations and Commitments – Jessica Pearson" document.  Because of this

difference in goals, there was no reason for Plaintiff to have as large a sales

territory as her comparators.  In light of these details in the record, and with no

evidence that Plaintiff's gender motivated the sales goals or territory, Plaintiff's

unique sales territory does not directly reflect a discriminatory attitude.

In numbers four through six above, Plaintiff alleges that she was excluded

from team conference calls, was forbidden from working remotely, and was not

recognized for the training that she gave to her team.  These allegations of

differential treatment are insufficient because the evidence supporting them is

vague and conclusory.  Plaintiff only cites her declaration with respect to these

claims; however, her declaration does not detail key aspects of these facts that

would support a finding of discrimination:

> Osmond failed to recognize me for training I gave to my team, but
> recognized a male team member for similar training he provided;
> excluded me from team conference calls but did not exclude male
> team members; and forbade me from working remotely while
> allowing her [sic] male team members to work remotely.

(Pearson Decl. ¶ 3.)  Plaintiff offers no further details about the alleged

differential treatment, and she has not indicated the context, timing, or frequency

of these alleged incidents.  Without more detail, these incidents cannot be

reasonably categorized as reflective of a discriminatory attitude.  Moreover,

Plaintiff has failed to sufficiently demonstrate that her male comparators were

similarly situated in light of Plaintiff's extensive performance problems related to

timeliness, professionalism, customer complaints, failure to use CRM, and

repeated failures to make sales goals.

With respect to number seven, Plaintiff alleges that she was formally

reprimanded for purportedly not meeting her sales goals, while her manager did

not formally reprimand a male team member—who had more experience than

Plaintiff—for not meeting sales goals.  By "formal reprimand," Plaintiff is likely

referring to the verbal counseling she received from Osmond.  (See Pl.'s Opp'n

Mem. 9; Osmond Dep. 59.)  The record demonstrates that Plaintiff's verbal

counseling did not concern her failure to meet sales goals; instead, it was related

to Plaintiff's other performance concerns.  (Osmond Aff., Ex. 7.)  Additionally,

Plaintiff fails to show that the male comparator was similarly situated to the

Plaintiff, as he did not have many of the same problems with timeliness,

professionalism, or customer complaints that led to the reprimand.  Furthermore,

the male employee was orally reprimanded during one-on-one meetings, and

Osmond had discussions with his supervisor about the male employee's failure

to meet sales goals.  (<u>See</u> Osmond Dep. 59-60.)

   With respect to number eight, Plaintiff alleges that Osmond shared a

private communication between him and Plaintiff with other team members.

Plaintiff only cites the Osmond deposition to support the assertion that this

happened.  (<u>See</u> Osmond Dep. 36-37.)  In the deposition, however, Osmond

describes the incident as an inadvertent mistake: "[T]here was one occasion

when we were on a team call that during that I was attempting to send out a

document to the entire team to review, and I inadvertently sent the wrong

document."  (<u>Id.</u> at 37.)  That document was an instant message conversation

Osmond had had with the HR Department.  (<u>Id.</u>)  Plaintiff was not expressly

named in the document, but the conversation was about Plaintiff.  (<u>Id.</u>)

Considering this more complete description of the incident, there is no evidence in the record to show that Defendant intentionally shared the document, and therefore, this incident does not reflect a discriminatory intent.

Finally, regarding number ten, Plaintiff alleges that her file was papered, which, presumably, did not happen to other team member's files.  Plaintiff's papering allegation (discussed more fully within the retaliation claim, below) is not based on competent, admissible evidence because it is mainly supported by Plaintiff's attorney's personal analysis of document metadata within the Jessica Pearson Event Timeline.  More significantly, for purposes of the discrimination claim, Plaintiff's assumption that Osmond did not keep notes regarding other term members is speculative and insufficient to avoid summary judgment, especially considering that Osmond has testified that he did keep a file of other employees.  (See Osmond Dep. 89-90 ("I do keep a—a file . . . on my computer of other employees.").)  Finally, Plaintiff admits to most of Defendant's allegations that were reflected in the timeline, e.g., issues with timeliness and meeting sales goals.  In light of this, Plaintiff has not provided sufficient evidence to support the papering allegation or the claim that she was treated differently from

similarly situated employees.  Therefore, a reasonable factfinder could not find Osmond's conduct to be discriminatory here.

In summary, Plaintiff has not provided evidence that "clearly points to the presence of an illegal motive," and Plaintiff lacks "specific factual evidence" that gender was a motivating factor in Defendant's termination decision.  Torgerson, 643 F.3d at 1044 ("[I]f the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment . . . through the McDonnell Douglas analysis . . . ."); see also Torlowei v. Target, No. Civ. 02-933, 2004 WL 229081, at *10 (D. Minn. Feb. 3, 2004) (holding that a plaintiff's discrimination claim failed because she produced no "specific factual evidence" that her race or national origin was a motivating factor in her termination).  The above allegations are either conclusory, unsupported by the evidence, or concern employees who were not similarly situated to Plaintiff.  Considering the record as a whole, there is not enough evidence for a reasonable factfinder to find for Plaintiff on the discrimination claim, even if the facts are viewed in the light most favorable to her.

### E.  Sex-Based Discrimination Under the Burden-Shifting Analysis

The Court will now briefly consider Plaintiff's claim under the burden shifting framework.

### 1. Prima Facie Case

Plaintiff has failed to establish a prima facie case for discrimination because she cannot show element three—that she met the legitimate expectations of her employment at U.S. Bank.  Plaintiff has admitted numerous times that many of the criticisms of her job performance were valid and non-discriminatory.  Her negative performance history was long-term and well-documented by multiple supervisors and continued throughout her employment with U.S. Bank.  The factual background of this case and the following evidence establish Plaintiff's poor performance: (1) Plaintiff's 90-day review; (2) her June 2011 PIP; (3) her 2012 performance review; (4) her June 2012 verbal warning; and (5) her August 2012 Final Written Warning.  This evidence strongly supports that Plaintiff was terminated because of her poor performance.  In light of this record, no reasonable factfinder could conclude that Plaintiff met the legitimate expectations of her employment.

Nevertheless, Plaintiff argues that factual questions about performance preclude summary judgment.  Specifically, Plaintiff disputes the number of sales that she made in 2011, arguing that she closed 14 deals as opposed to the 12

noted by Tom Ayers.  This factual dispute is immaterial because either number of sales remains well below the Defendant's expectations of 25 sales in 2011.

Furthermore, Plaintiff cannot demonstrate element four—that similarly situated male employees were treated differently.  Plaintiff's alleged comparators were not subject to the same standards that she was, nor were they engaged in the same conduct without any mitigating or distinguishing circumstances.  As noted above, Plaintiff was held to a higher standard because of her higher pay level and great experience.  Plaintiff disputes this fact, but her dispute is not genuine.  She alleges that the "Grade 13" and "Grade 14" job descriptions are not distinguishable and that the duties and expectations of the positions are virtually identical.  However, the job descriptions submitted by Plaintiff expressly indicate differences between the size and complexity of customers, profit potential, and required experience for these positions.  (See Williams Aff., Ex. D, U.S. Bancorp Job Description, at D00088 (showing that "Grade 13" employees deal with "medium to large customers with a good potential for profit" and require "five years" of experience, whereas "Grade 14" employees deal with "large and more complex customers with a high potential for profit" and require "five to eight years" of experience).)  Regardless of these distinctions, Plaintiff still fails to meet

element four because no other employee on her team suffered from the

numerous performance issues documented and admitted by the Plaintiff.

Viewing the facts in the light most favorable to Plaintiff, she is unable to

establish a prima facie case of discrimination under the burden shifting analysis

or the direct method.  Accordingly, the Court dismisses Plaintiff's discrimination

claim.

### F.  Reprisal Under the Direct Method

Plaintiff has also raised a claim of reprisal under the MHRA, alleging that

she was terminated as retaliation for complaining of discrimination.  MHRA

reprisal claims are analyzed in the same way as federal discrimination claims

(e.g., Title VII claims).  Colenburg v. STARCON Int'l, Inc., 656 F. Supp. 2d 947,

956 n.7 (D. Minn. 2009).  Similar to discrimination claims, MHRA reprisal claims

can be proven with either direct or indirect evidence.  Springer, 692 F. Supp. at

1056.  To show reprisal using the direct method, a plaintiff must provide direct

evidence of retaliation by her employer.  See Guimaraes v. SuperValu, Inc., 674

F.3d 962, 978 (8th Cir. 2012).

Plaintiff offers two main arguments in attempting to demonstrate reprisal.

First, Plaintiff argues that reprisal occurred because the Jessica Pearson Event

Timeline shows that Osmond "papered her file."  Second, Plaintiff argues that the timing of her complaint and her termination demonstrate that she was terminated in retaliation for making the complaint.

### 1. Claim that Osmond Papered Plaintiff's File

Plaintiff alleges that the Jessica Pearson Event Timeline was created after Plaintiff complained of discrimination.  Plaintiff refers to both her December 10, 2012 call to HR complaining of unfair treatment as well as her December 26, 2012 call to U.S. Bank's ethics hotline complaining of discrimination based on gender. According to Plaintiff, (1) the termination decision did not occur in early December, but happened after her complaint and at least partially <u>because of</u> her complaint, and (2) sometime after her complaint and before the decision, Osmond created documentation that falsely represented Plaintiff's poor performance in efforts to make her termination appear legitimate.  In other words, Osmond "papered Plaintiff's file."  "Papering a person's file" with negative reports can be considered sufficiently adverse to meet the standard for reprisal claims.  <u>See</u> <u>Tademe v. Saint Cloud State Univ.</u>, 328 F.3d 982, 992 (8th Cir. 2003).  However, to meet the standard, the papered file must be a basis for the adverse employment action.  <u>See</u> <u>id.</u>

Here, Plaintiff alleges that U.S. Bank retaliated against her act of filing a discrimination complaint by terminating her employment.  In attempting to establish this with direct evidence, Plaintiff refers to evidence that Osmond "papered her file" as retaliation for the discrimination complaint.  Plaintiff argues that the evidence of "papering" is the Jessica Pearson Event Timeline itself, which Plaintiff claims indicates that it was created after Plaintiff made her discrimination complaint to U.S. Bank in December.  Plaintiff concludes that the metadata in the Jessica Pearson Event Timeline demonstrates that Plaintiff's file was papered and the timeline was a basis for her termination.  The Court concludes that Plaintiff's efforts to show "papering" fail and do not amount to even a genuine fact dispute.

Plaintiff argues that document metadata indicates that Osmond created the Jessica Pearson Event Timeline after she complained of discrimination, and therefore, the timeline was not a contemporaneous document, but rather a retaliatory document created after-the-fact.  However, Plaintiff's argument here fails, and the metadata analyzed by Plaintiff's attorney does not create a genuine dispute of material fact.  Plaintiff's attorney's opinion testimony about the document's metadata is not competent expert testimony and is inadmissible.

Plaintiff seeks to offer conclusions about metadata that are speculative, especially in light of the common understanding that "creation dates" in metadata may be altered by copying a document or moving it to a new location (e.g., "save as" function on a word processor).  See, e.g., Florida Bar v. MacNamara, 132 So. 3d 165, 170 (Fla. 2013) ("[M]etadata can be misleading because if someone moves a file or copies a file to another folder, or in some situations, when someone re-saves the file, the creation date will change.").  Without more information from a computer forensics expert, Plaintiff has not adequately refuted this common understanding of how metadata works.  She has only introduced metaphysical doubt, but has not come forward with specific facts to show that there is a genuine issue for trial as to whether Osmond papered her file.

Furthermore, even if Osmond did paper Plaintiff's file, she would still have to show that the Jessica Pearson Event Timeline was a basis for her termination decision.  Plaintiff has not shown that the timeline played any role in the decision to terminate her employment.  This is a significant omission in the face of Plaintiff's admitted performance problems (e.g., tardiness, working on projects at the last minute, failure to meet sales goals, etc.).  These problems were not only admitted by Plaintiff, but they were well-documented.  In light of this

record, Plaintiff has not demonstrated that the timeline was even relevant to the decision-making process.

## 2. Timing of the Termination Decision

In addition to raising issues regarding the Jessica Pearson Event Timeline, Plaintiff also addresses the timing of her termination.  Plaintiff argues that Defendant committed reprisal because the decision to terminate Plaintiff actually occurred after she complained of being treated unfairly, not beforehand.  Plaintiff is attempting to raise a genuine dispute of material fact as to the sequence of events surrounding her termination.  However, the Court concludes that Plaintiff's fact dispute is not genuine, and it is ultimately immaterial.

Plaintiff first focuses on the Jessica Pearson Event Timeline.  She argues that there is at least a fact dispute regarding the timing of the termination decision because different versions of the Jessica Pearson Event Timeline reflect discrepancies about the termination decision.  Two of the versions (with unknown metadata "creation dates") do not contain contemporaneous notes about the termination decision conversation in early December.  Plaintiff suggests that it makes no sense for the Jessica Pearson Event Timeline to omit notes about the meeting in which Osmond and others decided to terminate Plaintiff.  Plaintiff points out that a third version of the timeline, with a creation

date of December 31, 3012, <u>does</u> include notes about the termination decision

conversation in early December.

Second, Plaintiff argues that the purported timing of her termination

decision does not make sense.  She contends that it defies logic that: (1) U.S. Bank

would make its decision to terminate Plaintiff in early December of 2012 but then

wait until February 20, 2013 to actually terminate Plaintiff, and (2) Mohs met

with Plaintiff on December 10, 2012, and gave Plaintiff resources to improve

Plaintiff's performance while at the same time knowing she would be

terminated.  Plaintiff argues that this shows that her termination was actually a

response to her complaint.

There are several reasons why Plaintiff's attempts to create a fact dispute

fail.  First, Plaintiff cannot successfully argue that the Jessica Pearson Event

Timeline, in itself, shows that Osmond's record of the termination decision was

false or even doubtful because, as the Court previously held, Plaintiff's metadata

argument fails.  Furthermore, Plaintiff fails to mention or rebut the deposition

testimony of Osmond or Ingerson, which both support that the termination

decision took place in early December.  (Osmond Dep. 48; Ingerson Aff. ¶ 2.)  For

these reasons, Plaintiff's arguments that the timeline itself suggests the

termination date did not take place in early December are unpersuasive and the fact dispute is not genuine.

Nevertheless, if Plaintiff's factual dispute about the timing of termination was genuine, it would ultimately be immaterial because "timing alone [is] insufficient to support a reasonable inference of pretext and retaliatory motive." Hervey, 527 F.3d at 726.  This is especially true if "the employer had been concerned about a problem before the employee engaged in the protected activity."  Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).

Here, there is ample evidence of Defendant's concern about Plaintiff's performance problems before Plaintiff engaged in the protected activity of lodging her complaint.  The concern is evidenced by (1) her 90-day review; (2) her June 2011 PIP; (3) her 2012 performance review; (4) her June 2012 verbal warning; and (5) her August 2012 Final Written Warning.  Therefore, Plaintiff's suggestion that retaliation is shown by temporal proximity of her complaint and termination is weakened.

Furthermore, there was an intervening event between the alleged decision date and termination date: the HR investigation.  This investigation was completed February 4, 2013, and Plaintiff was terminated approximately two

weeks later.  Osmond attests to the role of the investigation in delaying Plaintiff's

termination: "[O]nce the complaint . . . was made, the role was of human

resources to work through that complaint, and then once the findings had been

produced, then we proceeded."  (Osmond Dep. 71.)  Plaintiff's argument that it is

illogical for U.S. Bank to have waited so long to terminate her fails to recognize

this intervening, delaying event.  Therefore, without direct evidence, Plaintiff

cannot show any causal connection between her complaint and the termination

decision, not even that her termination was motivated in part by her

discrimination complaint.

Considering the record as a whole, the Court concludes that Plaintiff's

dispute about the Jessica Pearson Event Timeline and the timing of the

termination decision are not genuine and are ultimately immaterial.  Viewing the

evidence in the light most favorable to Plaintiff, no reasonable factfinder could

conclude that Plaintiff was terminated in retaliation for complaining of

unfairness.

### G. Reprisal Under the Burden-Shifting Analysis

As with discrimination claims, Plaintiff has not argued reprisal under the

burden-shifting approach.  However, the Court will briefly analyze why

Plaintiff's cannot avoid summary judgment of her reprisal claim, even under this approach. The three-part <u>McDonnell Douglas</u> burden-shifting approach is applicable to MHRA reprisal claims. <u>Bergstrom-Ek v. Best Oil Co.</u>, 153 F.3d 851, 859 (8th Cir. 1998). To establish a prima facie case of reprisal, the plaintiff must show that (1) she engaged in a protected activity, (2) the defendant took adverse action against her, and (3) there is a causal connection between the two. <u>Id.</u>

If a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory, non-retaliatory reason for its action. <u>Muor v. U.S. Bank Nat'l Ass'n</u>, 716 F.3d 1072, 1076 (8th Cir. 2013). If such reason is offered, then the plaintiff must show that the employer's articulated reason was pretext. <u>Id.</u> To do so, the plaintiff may (1) show that the employer's proffered reason is "unworthy of credence" or (2) "persuad[e] the court that a [prohibited] reason more likely motivated her termination than the proffered reason." <u>Springer</u>, 692 F. Supp. 2d at 1057 (internal quotation marks omitted).

### 1. Prima Facie Case

As noted above, Plaintiff has not provided evidence that demonstrates any causal link between her filing of a discrimination complaint and her termination, and therefore, she fails to make a prima facie case of reprisal.

48

## 2. Legitimate, Non-Discriminatory Reason for Termination

Even if Plaintiff had established a prima facie case, Defendant has made a strong showing that it had legitimate, non-discriminatory reasons for terminating Plaintiff: her performance problems.  U.S. Bank documented Plaintiff's performance problems over an extended period of time and Plaintiff received progressively more severe warnings, culminating in the Final Written Warning in August 2012.  Defendant offers that Plaintiff's termination was justified in light of her problems meeting expectations and failure to do so after the several, factually-undisputed, instances of being told that her behavior did not meet expectations.

## 3. Pretext

Because Plaintiff does not agree with the burden-shifting method of analysis in her reprisal claim, she makes no attempt on to show pretext here.  In any event, based on the Court's previous analysis regarding the papering and timing allegations, the Court concludes that Plaintiff cannot show pretext.

Finding no genuine dispute of material fact, and viewing the record in the light most favorable to Plaintiff, the Court concludes that there is insufficient evidence by which a reasonable juror could find for Plaintiff on either claim. Accordingly, based on all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendant U.S. Bank National Association's Motion

for Summary Judgment [Docket No. 20] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   August 21, 2014          s/ Michael J. Davis
                                  Michael J. Davis
                                  Chief Judge
                                  United States District Court